## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| KARL GEORGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:19-cv-01617-SGC |
| | ) | |
| COMMISSIONER, SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

The plaintiff, Karl George, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for a period of disability and disability insurance benefits. (Doc. 1).[2] George timely pursued and exhausted his administrative remedies, and the decision of the Commissioner is ripe for review. For the reasons stated below, the Commissioner's decision is due to be reversed and remanded.

## I.    FACTS, FRAMEWORK, AND PROCEDURAL HISTORY

George was forty-two at the time of his alleged disability onset (October 11, 2012), forty-seven on his date last insured ("DLI") (September 30, 2017), and forty-

---

[1] The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 6).

[2] Citations to the court's record refer to the document and page numbers assigned by CM/ECF and appear in the following format: "(Doc. __ at __)." Citations to the administrative record refer to the page numbers assigned by the Commissioner and appear in the following format: "(R. __)."

nine as of March 13, 2019, the date the Administrative Law Judge ("ALJ") issued the unfavorable decision now under review. (R. 48-49, 209, 227).[3] George speaks English and has a high school education. (R. 48). His past employment experience includes work as an auto salesperson. (R. 48, 209). At the first hearing on July 31, 2014, George testified he could no longer work due to problems with his knee and his heart. (R. 296). At the first supplemental hearing on May 12, 2015, George testified he could no longer work because he was unable to walk, had pain and numbness in his arms and legs, had trouble with his neck and back, and was unable to sit or stand for long periods of time. (R. 267, 270-72). At the second supplemental hearing on July 26, 2018, George testified he could no longer work due to pain in his knees, back, neck, and shoulders, as well as anxiety and depression. (R. 211).

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001). The first step requires a determination whether the claimant is performing substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in SGA, he or she is not disabled, and the evaluation stops. *Id.* If the claimant is not

---

[3] This was the ALJ's second decision in this case; the first was dated January 28, 2016. (R. 338-55). The Appeals Council remanded, and the ALJ conducted a second supplemental hearing on July 26, 2018. (R. 204-62, 360-64). On March 13, 2019, the ALJ issued a new decision denying George's application. (R. 16-49). On September 19, 2019, the Appeals Council denied his request for review. (R. 1-7). The instant appeal followed.

engaged in SGA, the Commissioner proceeds to consider the combined effects of all the claimant's physical and mental impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). These impairments must be severe and must meet durational requirements before a claimant will be found disabled. *Id.* The decision depends on the medical evidence in the record. *See Hart v. Finch,* 440 F.2d 1340, 1341 (5th Cir. 1971).[4] If the claimant's impairments are not severe, the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Otherwise, the analysis continues to step three, at which the Commissioner determines whether the claimant's impairments meet the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairments fall within this category, the claimant will be found disabled without further consideration. *Id.* If the impairments do not fall within the listings, the Commissioner determines the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four the Commissioner determines whether the impairments prevent the claimant from returning to past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is capable of performing past relevant work, he or she is not disabled, and the evaluation stops. *Id.* If the claimant cannot perform past

---

[4] In *Bonner v. City of Prichard*, 6661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

relevant work, the analysis proceeds to the fifth step, at which the Commissioner considers the claimant's RFC, as well as the claimant's age, education, and past work experience, to determine whether he or she can perform other work. *Id.*; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can do other work, he or she is not disabled. *Id.*

Applying the sequential evaluation process, the ALJ found George had not engaged in SGA from his alleged onset date of October 11, 2012, through his DLI. (R. 20). The ALJ determined George had the following severe impairments through his DLI: obesity, osteoarthritis, degenerative disc disease ("DDD"), status post total knee replacement of both knees, status post shoulder arthroscopy, and bradycardia/cardiomegaly status post implantation of pacemaker. (*Id.*). However, the ALJ found George did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (R. 31). At the next step, the ALJ determined George had the RFC:

> to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except the claimant can occasionally lift and carry ten pounds and frequently lift and carry less than ten pounds. The claimant can stand/walk for two hours with a cane and sit for six hours in an eight-hour workday with normal breaks. The claimant cannot kneel or crawl, but he can occasionally crouch and stoop. The claimant cannot reach overhead with his left upper extremity, but he can occasionally reach in all other directions with his left upper extremity. The claimant should avoid all exposure to vibration, hazardous machinery, and unprotected heights.

(R. 32).

The ALJ determined George was unable to perform any past relevant work through his DLI. (R. 47). At the hearing, the Vocational Expert ("VE") testified that, considering George's age, education, work experience, and RFC, there were a significant number of jobs in the national economy he could perform. (R. 48). The ALJ concluded by finding George was not under a disability, as defined in the Social Security Act, at any time through his DLI, September 30, 2017. (R. 49).

## II.    STANDARD OF REVIEW

A court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Stone v. Comm'r of Soc. Sec.*, 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). A court gives deference to the factual findings of the Commissioner, provided those findings are supported by substantial evidence, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

Nonetheless, a court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004)). "The substantial evidence standard permits administrative decision makers

to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if a court finds that the proof preponderates against the Commissioner's decision, it must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400 (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

No decision is automatic, for "despite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## III. DISCUSSION

On appeal, George contends the ALJ's decision should be reversed and remanded for two reasons: (1) the ALJ failed to properly evaluate the medical opinions of Lloyd Dyas, M.D., and Keith Morrow, M.D.; and (2) the ALJ showed bias during the hearing. (Doc. 11 at 25, 37). As explained below, the ALJ erred in discounting Dr. Dyas's opinions, warranting reversal and remand to the

Commissioner. Therefore, analysis of Dr. Morrow's opinions is not required here; the Commissioner can consider these opinions, together with the other medical evidence, on remand. Furthermore, while George has not satisfied the standard for reversal based on bias, the ALJ's conduct during the hearing, together with errors in the ALJ's decision, are sufficient to bring his partiality into question. Accordingly, the Commissioner will be directed to assign this matter to a different ALJ on remand. These conclusions are discussed in turn.

###### A.     Evaluation of Medical Opinions

George argues the ALJ failed to properly consider the medical opinions of record, particularly with regard to his pain, his doctors' attempts to treat it, and its limiting effects on his ability to function. (Doc. 11 at 25-37). In support of this argument, George contends the ALJ selectively cited the record, ignoring medical evidence which did not support his conclusion. (*Id.* at 26). George also takes issue with the ALJ's assignment of weight to the medical opinions in the record. Specifically, the ALJ assigned little weight to the opinions of George's treating physicians (Drs. Dyas and Morrow) but assigned greater weight to the opinions of two consultative examiner's (Easton Norwood, III, M.D., and Laura Lindsey, M.D.) and the non-examining medical expert (Peter Schosheim, M.D.). (*Id.* at 26, 30-31; Doc. 14 at 2-3).

An ALJ must articulate the weight given to different medical opinions in the record and his supporting reasons. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). The weight afforded to a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

A treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford*, 363 F.3d at 1159 (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted). "Good cause" to discount a treating physician's opinion exists where the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241 (11th Cir. 2004) (citing *Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) ("good cause" existed where the opinion was contradicted by other notes in the physician's own record). In short, an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983).

Also, opinions such as whether a claimant is disabled, the claimant's RFC, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d); *see also Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986) (although a claimant's physician may state he is disabled or unable to work, "the agency will nevertheless determine disability based upon the medical findings and other evidence."). The court is interested in the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, since the ALJ bears the responsibility for assessing a claimant's RFC. *See, e.g.,* 20 C.F.R. § 404.1546(c).

### 1.    George's Treatment with Dr. Dyas

Dr. Dyas is an orthopedist who first treated George in 1987, when he performed a left knee surgery. (*See* R. 823). As relevant here, George returned to Dr. Dyas in early 2009 on a referral driven by complaints of left knee pain and back pain. (*Id.*). Over the next nine years, Dr. Dyas treated George neck, back, left shoulder, and bilateral knee pain. Dr. Dyas ultimately performed five additional surgeries: two on his left knee, two on his right knee, and one on his left shoulder.

The record reveals Dr. Dyas examined George at least thirty-five times between January 2009 and August 2017. (R. 823-92, 946, 1013, 1018, 1080, 1085, 1090, 1116, 1372, 1384). This tally does not include visits in which George saw physical therapists or nurses in Dr. Dyas's office (*see* R. 878, 1150, 1157, 1162, 1184, 1381); nor does it include the surgeries Dr. Dyas performed (*e.g.* R. 887, 889, 1228). Dr. Dyas's treatment of George's various joint and spinal ailments is summarized below.

a.  Knee Problems

When George was first referred to Dr. Dyas in 2009, he reported he had not recovered from a left knee injury sustained a year earlier; this knee injury also aggravated his back pain. (R. 823). Dr. Dyas's examination revealed George's knee was "locked" and he could not fully extend it for the last ten to fifteen degrees; he also had a positive hyperflexion test, exquisite tenderness, a positive grind test, and a positive McMurray's signal in the medial compartment. (*Id*.). X-rays of the left knee showed calcification of the medial and lateral menisci but good joint space and alignment. (*Id*.). Dr. Dyas diagnosed George with internal derangement of the left knee and chronic back pain; he classified George's locked knee as an urgent indication for arthroscopy and arthroscopic debridement. (R. 824). Dr. Dyas performed an arthroscopy of George's left knee on February 10, 2009. (R. 885-86). George continued to see Dr. Dyas regularly, and by September 9, 2011, his left knee

pain had worsened with the joint locking up again; a subsequent round of steroid injections appears to have been temporarily effective. (R. 842-44).[5]

On June 10, 2013, George reported he had reinjured his left knee. (R. 870). Dr. Dyas noted pain medication, including OxyContin, was ineffective; X-rays revealed end-stage osteoarthritis of the left knee. (R. 872). On June 20, 2013, Dr. Dyas performed a total arthroplasty of George's left knee. (R. 887-888). Recovery from this knee replacement surgery was difficult, and two months later George reported constant pain; Dr. Dyas noted he could not bend his left knee at all at this time. (R. 879). Dr. Dyas administered a steroid injection, which appears to have been effective. (R. 881).

Soon after George's left knee replacement, be began experiencing pain in his right knee. On September 18, 2013, George reported this pain to Dr. Dyas, noting Dr. Morrow suspected he had a torn meniscus based on X-rays. (R. 882). On December 10, 2013, Dr. Dyas performed a right knee arthroscopy. (R. 1244). By August 22, 2014, George was experiencing persistent, worsening pain in his right knee, for which Dr. Dyas administered steroid injections. (R. 1082, 1085). By July 8, 2015, George's right knee pain was getting much worse, and he had limited range of motion. (R. 1116). On July 23, 2015, Dr. Dyas performed a total arthroplasty

---

[5] While Dr. Dyas administered the foregoing treatment while George was still working, and prior to his alleged disability onset, it shows the progression of his condition. Pre-onset records regarding George's back problems will be discussed for the same reason.

on George's right knee. (R. 1129). George continued to experience pain and swelling in his right knee as of September 30, 2015. (R. 1157). By November 23, 2015, George's right knee was still weak. (R. 1162).

In January 2017, George was involved in an automobile accident in which his knees hit the dashboard after he collided with a deer; following the accident, George complained of popping in his left knee and constant pain in his right knee. (R. 1372). Although September 30, 2017, was George's date last insured, Dr. Dyas's subsequent treatment notes show his continued complaints of significant knee pain. By December 4, 2017, George noted painful popping in his left knee, sometimes causing his knee to give way; Dr. Dyas noted he walked with a cane. (R. 1573). George continued to complain of chronic, bilateral knee pain on May 21, 2018, and July 16, 2018. (R. 1588, 1627).

b.     <u>Spinal Problems</u>

George's referral to Dr. Dyas was also motivated by his complaints of back pain. During the initial January 12, 2009 visit, Dr. Dyas's examination revealed: (1) diminished range of motion of the lumbar spine; (2) right paraspinal muscle spasm; and (3) a positive straight leg test on the right. (R. 823). X-rays of the lumbar spine were normal. (*Id.*). On July 20, 2009, George returned, complaining of back pain; examination revealed limited range of motion in the lumbar spine. (R. 825). On that visit, George designated Dr. Dyas to oversee his pain management plan; at the

time, George's pain management consisted of 60 mg of OxyContin three times a day. (*Id.*). George continued to complain of lumbar spine pain, and Dr. Dyas consistently—although not uniformly—noted paraspinal muscle spasm, limited and painful range of motion, positive straight leg raise on the right, and tenderness of the sciatic notch. (*See, e.g.,* R. 827-29, 831-37, 841, 843, 846, 849, 852, 855, 858, 861, 865, 868). After X-Rays and an MRI of the lumbar spine revealed DDD at L5-S1 with nerve impingement by a bulging disc, Dr. Dyas diagnosed George with right sided sciatica and radiculopathy of the L5-S1 nerve root. (R. 829-30). Dr. Dyas continued to recommend conservative therapy and noted treatment—pain medication, lumbar epidural steroid injections, lumbar parvertebral facet injections, and physical therapy—had been effective. (R. 833).[6] However, beginning on December 13, 2010, George consistently rated his back pain, which radiated to his right thigh, as seven or eight on a ten-point scale. (*Id.*; *e.g.* R. 836, 839, 842, 845, 848, 851, 854, 857, 864, 867, 870, 946, 1009, 1013, 1018, 1387, 1568, 1573, 1577, 1581, 1586).[7]

---

[6] As time passed, Dr. Dyas more frequently noted pain medication had been "somewhat effective." (*E.g.* R. 839, 842, 845, 848, 851, 854, 857, 860, 864, 867).

[7] On October 19, 2012, George rated his pain as six out of ten, but he also said the pain was unchanged during the subsequent visit, when he rated it at seven. (R. 860; *see* R. 864). In July and August 2013, George rated his pain as nine out of ten, although it appears this was related to the left knee replacement. (R. 873, 879).

On April 16, 2012, George complained of worsening back pain following a fall. (R. 851). X-rays revealed DDD at multiple levels. (*Id.*). Subsequent exams revealed "right sided paraspinal board like muscle spasm" and "markedly positive" straight leg raising at forty-five degrees. (R. 853, 856). Dr. Dyas increased George's pain medication, recommended physical therapy and steroid injections, and referred him to a spinal specialist. (*Id.*). At a follow-up visit on May 11, 2012, Dr. Dyas interpreted a recent MRI as showing "L1-2 through L4-5 disc desiccation/degeneration but no focal disc protrusion, L5-S1 disc with asymmetrical spurring, right greater than left, contributing to right lateral recess stenosis." (R. 854; *see* R. 894). Around this time, George was prescribed 20 mg oxycodone tablets three times a day, in addition to his OxyContin prescription. (*See*, *e.g.*, R. 874).

On September 18, 2013, after George had improved following his left knee replacement surgery, he complained of "terrible back pain," starting at the back of his neck and traveling all the way down to his buttocks. (R. 882). Two rounds of epidural steroid injections had not improved his pain, although he was scheduled for a third. (*Id.*). George rated his pain as nine out of ten, and stated he was unable to sleep or get comfortable. (*Id.*). In addition to paraspinal muscle tenderness and reduced, painful range of motion—noted in every examination since September 2009—this examination revealed positive straight leg tests bilaterally, worse on the left. (R. 883). Dr. Dyas diagnosed George with low back pain, lumbar paraspinal

muscle spasm, degenerative lumbar disc disease, sacrollitis, lumbar radiculitis, lumbar spinal stenosis, and right sciatica. (R. 884).

By January 15, 2014, while recovering from his right knee arthroscopy, Dr. Dyas noted George experienced impairment from chronic lower back pain and DDD; he opined George was unable to crouch, crawl, kneel, lift, bend, stoop, or climb. (R. 947). On May 23, 2014, Dr. Dyas noted George was "showing signs of pain behavior," his gait was "somewhat antalgic," and he suffered from "well documented pain generators with chronic low back pain with degenerative disc disease and osteoarthritis of both knees." (R. 1018-20).

On September 20, 2015, while recovering from his right knee replacement surgery, George complained of worsening neck pain; the pain had been present for years following a whiplash injury but had increased significantly over the previous three to six months. (R. 1157). George described his neck pain, which he rated as eight out of ten, as radiating down his left arm with intermittent finger numbness. (*Id.*). In addition to paraspinous muscle tenderness, Dr. Dyas noted limited and painful range of motion with mild crepitus, and muscle spasm. (R. 1158-59). At this point, George was prescribed a fentanyl patch, in addition to his oxycodone and OxyContin prescriptions. (R. 1159). Physical therapy was ineffective, and he continued to experience neck pain as of November 23, 2015, when cervical spine X-rays showed multiple level DDD. (R. 1162-64). A January 14, 2016 MRI showed

cervical DDD and chronic superior endplate compression at C6. (R. 1176). George continued to complain of neck pain as of February 17, 2016. (R. 1184). By this point, Dr. Dyas began weening George off some of his pain medication; his opiate prescriptions included a fentanyl patch and 30 mg oxycodone tablets every four hours. (R. 1186-87).

Following his shoulder arthroscopy, described below, George reported significant back pain on May 17, 2017; he rated his pain as 8 out of 10. (R. 1387). He requested and received injections to both sacroiliac ("SI") joints. (R. 1390). Although September 30, 2017, was George's date last insured, he continued to complain of back and neck pain through May 2018; in addition to opiate pain medication, he received additional SI injections. (*See* R. 1568, 1571, 1573, 1577, 1584). Dr. Dyas's examinations revealed globally diminished range of motion in the lumbar and cervical spine, tenderness of both SI joints, paraspinal muscle spasm, and mild crepitus. (R. 1390, 1571, 1575, 1579). December 4, 2017 X-rays revealed severe DDD at C5-6 and C6-7. (R. 1575). May 21, 2018 X-rays showed cervical radiculitis. (R. 1588)

c.    Shoulder Problems

On January 30, 2017, George reported sharp pain in his left shoulder blade which radiated to his left shoulder; he also complained of numbness and tingling in his left arm and hand, as well as pain when using or raising his left arm. (R. 1372).

George noted he had injured his left shoulder more than twenty years earlier. Physical examination revealed tenderness to palpation and painful range of motion above shoulder height. (R. 1374). Dr. Dyas performed a Speed's test, an A/C joint compression test, a cross chest adduction test, a Neer test, a Hawkins test, an O'Brien's test, and a drop arm test; all were positive. (*Id.*). X-rays revealed a narrowing of the AC joint with spur formation, and Dr. Dyas diagnosed George with a rotator cuff tear and osteoarthritis of the left shoulder. (R. 1374-75). On February 9, 2017, Dr. Dyas performed a left shoulder arthroscopy. (R. 1315). This was George's fifth orthopedic surgery since 2009 and his sixth overall.

### 2.    Dr. Dyas's Opinions

On July 25, 2014, Dr. Dyas completed a functional capacity assessment form, noting George's diagnoses of osteoarthritis in the right knee and lumbar spine, lumbar spine DDD, and status post-knee replacement. (R. 1041).[8] Dr. Dyas circled or filled-in answers indicating his opinions that George could: (1) sit continuously for two to three hours; (2) stand or walk continuously for only a "few minutes"; (3) sit for a total of three hours in an eight-hour day; (4) walk for one hour in an eight-hour day; and (5) occasionally lift and carry up to ten pounds. (R. 1042). On the same day Dr. Dyas completed the functional capacity assessment form, George's

---

[8] This was after three of George's knee surgeries but before his right total knee replacement.

17

counsel conducted a sworn recorded examination of him (collectively, the "July 2014 Opinion"). Dr. Dyas explained George:

> . . . has a much more severe form of degenerative disc disease in that it's not just one level, but of multiple levels, and much more severe than one would expect for his age. It is my professional opinion that this accounts for his chronic muscle spasm and chronic pain and impairment . . .

(R. 1034-35). Regarding George's right knee, Dr. Dyas explained:

> It is rapidly progressing to the indication for a knee replacement on that side also. He's just about exhausted all the conservative treatment and continues to suffer with severe pain and impairment of the right knee. The right knee replacement is already indicated on the right knee based on x-rays and his orthoscopic examination, which revealed bone-on-bone arthritis of the right knee joint.

(R. 1035-36).

George's counsel conducted a second sworn recorded examination of Dr. Dyas on August 28, 2017 (the "August 2017 Opinion"). (R. 1406-21). At one point, counsel asked Dr. Dyas to estimate how many times he had seen George over the previous eight years, inquiring, "would it be in the 30-50 range?" (R. 1411). Dr. Dyas responded affirmatively, saying "it would be more than 30." (*Id.*). Dr. Dyas also recounted George's numerous impairments. Regarding George's cervical spine, Dr. Dyas noted MRIs showed "severe degenerative disc disease with facet arthritis" and "foraminal encroachment with chronic stiff neck, chronic muscle spasm, and chronic pain with occasional neuropathic pain [] that goes down his arms." (R. 1413). Regarding George's lumbar spine, Dr. Dyas stated he had DDD

at multiple levels, causing chronic stiffness, muscle spasms, and neuropathic nerve pain in his legs. (R. 1413-14).

Dr. Dyas also noted George's bilateral knee replacements had not restored him to normal function:

> . . . He still has stiffness and weakness and difficulty getting out of a chair. He has difficulty going up and down stairs. He has difficulty walking beyond activities of daily living and occasionally has to use walking aids.
>
> When he gets out of a chair, it's not like someone with normal knees that can simply stand up out of a chair. He has to get his weight over his knees to enable him to stand up, and in order for him to do that, he has to push up with his arms. This causes a strain on his neck and aggravates his neck condition. He has to flex his spine forward to get his weight over his knees, which causes strain and aggravation and muscle spasm and pain in his lower back, not to mention the fact that his knees hurt if he has to do any sort of repetitive getting—even getting in and out of a chair, even with activities of daily living. This gentleman cannot walk beyond the activities of daily living.

(R. 1414-15).

### 3.     The ALJ's Decision

The ALJ gave little weight to Dr. Dyas's opinions. (R. 22, 35). As to the July 2014 Opinion and the August 2017 Opinion, the ALJ gave several reasons for assigning little weight to both: (1) they were *ex parte* depositions taken at the behest of George's counsel; (2) Dr. Dyas's "testimony"[9] consisted of answering

---

[9] The ALJ employed scare quotes when referring to Dr. Dyas's testimony in both sworn examinations. (*E.g.* R. 23-24, 35).

affirmatively to leading questions posed by George's counsel; and (3) Dr. Dyas's treatment notes "never mentioned" significant restrictions caused by George's ailments. (R. 23-24, 35-36). The rationale the ALJ employed to discount both opinions is addressed below.

That George's counsel secured Dr. Dyas's opinions does not provide good cause to reject them. *See Mulholland v. Astrue*, 06-2913, 2008 WL 687326, at *13 (N.D. Ga. Mar. 11, 2008). Next, the specific opinions that are the focus of this appeal are not the one-word affirmative answers to leading questions described by the ALJ. Indeed, the opinions at issue here describe George's conditions and their impact on him. Dr. Dyas's statements shed light on the crucial question of George's "condition and the medical consequences thereof." *Lewis*, 125 F.3d at 1440.

Next, contrary to the ALJ's conclusion, Dr. Dyas's treatment notes are replete with references to George's pain, objective testing revealing conditions likely to cause pain, and objective indicia of pain. This includes at least one occasion on which Dr. Dyas opined George could not crouch, crawl, kneel, lift, bend, stoop, or climb. (R. 947).[10] Additionally, the ALJ found both of Dr. Dyas's opinions were undermined by treatment records from George's cardiologist, Ram Sapkota, M.D. (R. 24, 38-39). Specifically, the ALJ noted Dr. Sapkota's examination notes often

---

[10] Of course, Dr. Dyas was sufficiently convinced of the severity of George's pain that he for years prescribed opiates to treat it.

did not mention musculoskeletal complaints or abnormalities. (*Id.*). Dr. Sapkota treated George for cardiovascular complaints and, on March 17, 2016, implanted a pacemaker. (R. 1304). That George's cardiologist did not note his musculoskeletal issues does not constitute good cause to discount the opinions of Dr. Dyas, his long-time treating orthopedist who performed five surgeries over an eight-year span. "More weight is given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *King v. Barnhart*, 320 F. Supp. 2d 1227, 1231–32 (N.D. Ala. 2004) (quotation marks omitted); *see Gholston v. Barnhart*, 347 F. Supp. 2d 1108, 1114-15 (M.D. Ala. 2003) (ALJ provided good cause for favoring non-treating psychologist's opinion over treating internist's opinion regarding claimant's psychological state).

In addition to the foregoing general reasons the ALJ gave for discounting both of Dr. Dyas's opinions, he also gave additional reasons specific to each individual opinion. These reasons are addressed in turn.

### a. The 2014 Opinion

Specific to the 2014 Opinion, the ALJ cited portions of Dr. Dyas's contemporaneous treatment notes as inconsistent with the limitations imposed. (R. 24). The ALJ also cited Dr. Norwood's consultative examination. (*Id.*). As explained below, neither effort provides a sufficient basis on which to reject the 2014 Opinion.

First, the ALJ cited treatment notes from the three examinations Dr. Dyas performed following the July 2014 Opinion; these visits occurred after George's left knee replacement and right knee arthroscopy but before his right knee replacement. (R. 24). During these visits, George's primary complaints concerned his right knee. (R. 1080, 1085, 1090). While the ALJ accurately reported Dr. Dyas's examination notes tended to show George's right knee condition was not worsening at that time, the ALJ ignored other aspects of these medical records. In particular, while Dr. Dyas noted George was "coping well" with his current pain management, that plan consisted of 30 mg doses of oxycodone and 80 mg doses of OxyContin, each administered orally three times per day. (R. 1082, 1087, 1092). Even with this aggressive opiate pain management, George reported his pain as a seven or eight out of ten. (R. 1080, 1085, 1090). Additionally, George requested and received right knee steroid injections during each visit, and Dr. Dyas noted George had not benefitted from conservative treatment. (R. 1083, 1088, 1093). Moreover, the ALJ's citations to these medical records did not mention George's complaints concerning chronic low back pain or Dr. Dyas's observation of paraspinal muscle spasm. (R. 1080-81, 1085-86, 1090-91; *see* R. 1083, 1088, 1093) (noting "well documented pain generators with chronic low back pain" and DDD).

Here, the ALJ erred in concluding the July 2014 Opinion was inconsistent with Dr. Dyas's treatment records. The ALJ's selective citation to portions of Dr.

Dyas's treatment notes do not support his conclusion. *See Ellington v. Astrue*, No. 07-0789, 2008 WL 1805435, at *10 (M.D. Ala. Apr. 18, 2008) (remanding to the Commissioner where the ALJ's citation to the medical record ignored portions "that did not support his conclusions"). Additionally, the relevance of the portions of Dr. Dyas's treatment notes cited by the ALJ is questionable at best. As previously noted, George's primary complaint during these visits concerned his right knee. While the ALJ cited these reports for the proposition that George's right knee was not significantly limiting his abilities, his condition worsened, and he underwent a total right knee replacement approximately one year after the July 2014 Opinion.[11] This subsequent treatment history essentially confirmed Dr. Dyas's opinion that his right knee was "rapidly progressing to the indication for a knee replacement." (R. 1035). Thus, Dr. Dyas's treatment records do not contradict the July 2014 Opinion.

Finally, the ALJ relied on Dr. Norwood's December 14, 2017 neurological consultative examination. (R. 24). Specifically, the ALJ cited portions of Dr. Norwood's report noting George had full range of motion and normal strength in his

---

[11] Any reliance on the report of Boyde J. Harrison, M.D., to discount Dr. Dyas's July 2014 Opinion would suffer from similar flaws. Dr. Harrison did not examine George; instead, he interpreted September 11, 2014 X-rays of his knees. In rejecting Dr. Morrow's opinions, the ALJ assigned substantial weight to Dr. Harrison's interpretation showing mild degenerative changes in George's right knee. (R. 27). To the extent the ALJ may have relied on Dr. Harrison's interpretation to discount Dr. Dyas's opinion, George's subsequent right knee replacement undermines any opinion that he suffered from mild degeneration.

limbs. (*Id.*).[12] While the ALJ noted Dr. Norwood's finding that muscle spasms were not present, he did not mention Dr. Norwood's observation that George exhibited only 20% of normal lumbar extension, rotation, and leaning. (*Id.*; R. 1543). That Dr. Norwood did not observe muscle spasms during his single examination of George in December 2017 does not provide substantial evidence to discount the consistent, contrary findings from his long-term treating orthopedist. In conjunction with the ALJ's failure to mention Dr. Norwood's observation of significantly diminished range of motion in George's lumbar spine, this renders inappropriate the ALJ's reliance on Dr. Norwood's report.

b.    The August 2017 Opinion

In discounting the August 2017 Opinion, the ALJ also relied on grounds not already discussed. Specifically, the ALJ questioned the accuracy of Dr. Dyas's statements regarding the extent of his treatment history with George. (R. 35). Next, the ALJ cited Dr. Dyas's contemporaneous treatment notes as being inconsistent with the August 2017 Opinion. The ALJ also relied on the consultative examination reports of Drs. Norwood and Lindsey. (R. 38-39). Specifically, the ALJ assigned significant weight to Dr. Lindsey's opinion; he also found Dr. Norwood's objective findings to be "very persuasive and supported by the evidence." (*Id.*; R. 46). Finally,

_____

[12] To the extent the ALJ relied on this finding to contradict the July 2014 Opinion regarding George's right knee, it is irrelevant. Dr. Norwood generated his report more than three years after the July 2014 Opinion and more than two years after George's total right knee replacement.

while the ALJ did not specify the weight assigned to the opinion of Dr. Schosheim—the medical expert who testified at the hearing—he found the opinion to be "very persuasive and probative." (R. 46). These reasons cited by the ALJ for discounting the August 2017 Opinion are addressed in turn.

During the August 2017 sworn examination, George's counsel inquired how many times Dr. Dyas had seen George over the preceding eight years, and whether it would be in the "30-50 range." (R. 1411). Dr. Dyas responded affirmatively, stating "it would be more than 30." (*Id.*). The ALJ, who misquoted George's counsel's question and Dr. Dyas's response, concluded this number of visits was not confirmed by the record. (R. 35). Contrary to the ALJ's conclusion, the voluminous record in this case reveals Dr. Dyas saw George at least 35 times between 2009 and August 2017. (R. 823-92, 946, 1013, 1018, 1080, 1085, 1090, 1116, 1372, 1384). Accordingly, the ALJ erred to the extent he afforded less weight to Dr. Dyas's August 2017 Opinion on this faulty premise.

Instead, the ALJ assigned significant weight to the opinion of Dr. Lindsay, a family practitioner who performed a consultative examination on December 30, 2013—before George's right knee replacement. (R. 38; R. 939-44). The ALJ found Dr. Lindsay's opinion was consistent with Dr. Dyas's contemporaneous examinations, which found "only mild swelling and tenderness" in George's right knee. (R. 38). The fact that George subsequently underwent a right total knee

replacement renders Dr. Lindsay's opinion regarding his right knee irrelevant. Moreover, the ALJ did not mention Dr. Lindsay's examination findings that George had significantly limited range of motion in his cervical spine and diminished flexion in his lumbar spine. (R. 943).

As to Dr. Norwood's December 14, 2017 consultative examination, the ALJ found it supported portions of Dr. Dyas's treatment notes, which the ALJ summarized as showing George's treatment regimen had reduced his pain and improved his quality of life. (R. 39). Importantly, Dr. Norwood is a neurologist, and his consultative examination consisted of a neurology evaluation. (R. 1543). As previously mentioned, Dr. Norwood examined George, reporting largely normal findings, aside from significantly reduced lumbar range of motion; George told Dr. Norwood during the examination that further movement of his lumbar spine was prohibitively painful. (*Id.*). Dr. Norwood ordered a nerve conduction study, which was largely normal. (R. 1539). Dr. Norwood opined George suffered from "back and neck pain worse with activity. He may be limited by pain, but I do not find neurologic deficit or evidence of physical neurologic impairment to do work related activities . . . ." (R. 1543). While Dr. Norwood clearly opined that George did not suffer from neurologic deficiencies which would impair his functional abilities, his statements regarding George's limitations due to pain are ambiguous. Additionally, the ALJ discounted Dr. Norwood's findings regarding diminished range of motion

in the lumbar spine, as well as his opinion that George was unable to sit, stand, or walk for more than ten minutes at a time; as grounds, the ALJ only noted these limitations were based on George's subjective complaints. (R. 46). Moreover, Dr. Norwood's conclusions do not contradict Dr. Dyas's statements regarding limitations based on non-neurologic impairments.

The ALJ also cited a contemporaneous treatment note from Dr. Dyas generated during a September 11, 2017 office visit. (R. 36-37). Contrary to the ALJ's summary of some of Dr. Dyas's more benign findings, the examination note reveals George: (1) reported back pain, estimated at eight out of ten; (2) requested and received bilateral SI injections; (3) exhibited limited range of motion in the cervical and lumbar spine; (4) exhibited moderate paraspinal muscle spasm and moderate SI joint tenderness; (5) and required a cane to ambulate. (R. 1568-1571). Additionally, the ALJ mischaracterized portions of Dr. Dyas's treatment notes as showing George's "symptoms were well controlled with medication." (R. 46). It is true that some of Dr. Dyas's treatment notes cited by the ALJ state George "had improved quality of life and diminished pain" (R. 1568, 1571, 1576) or "continues to benefit on his current pain management" (R. 1344, 1390). However, the medical records from these same examinations reveal George consistently estimated his pain as eight out of ten and exhibited paraspinal muscle spasm. (R. 1342, 1387, 1568,

1571, 1573).[13]  Also contradicting the ALJ's rosy pronouncement are Dr. Dyas's records showing George struggled with worsening pain when attempting to lower his opiate prescription dosages.  (R. 1576, 1583, 1589).

Finally, while he did not explicitly assign any particular weight to it, the ALJ concurred with Dr. Schosheim's opinion.  (R. 46).  Dr. Schosheim testified as a medical expert at the hearing but never treated George.  The opinion of a reviewing, non-examining physician cannot provide good cause to contradict a treating physician's opinion.  *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).  Moreover, because the ALJ's decision to discount the August 2017 Opinion is not otherwise supported by substantial evidence, the ALJ erred by eschewing Dr. Dyas's opinion in favor of Dr. Schosheim's.

For all of the foregoing reasons, the ALJ's decision to discount the opinions of Dr. Dyas is not supported by substantial evidence.  Accordingly, this matter will be reversed and remanded to the Commissioner for further consideration.

## B.    ALJ Bias

George also contends the ALJ's decision should be reversed due to bias.  (Doc. 11 at 37-41).  George submitted this claim to the Appeals Council in his

---

[13] The vast majority of Dr. Dyas's notes the ALJ cites to show George's pain was well-controlled or diminished with medication simply do not support the proposition.  (*See* R. 46).  Because the ALJ cites to entire exhibits rather than specific pages, the undersigned has reviewed the more than 250 pages of medical records cited.  (*Id.*).  Other than the records quoted above, the remaining pages do not support that George's pain was controlled or improved with medication.  Indeed, the overwhelming majority of these treatment notes support the opposite conclusion.

request for review, citing the ALJ's conduct during the July 26, 2018 hearing and requesting the Appeals Council listen to the recording of the proceedings. (R. 807-09). This is sufficient to present the claim of ALJ bias at the administrative level. *See Cooper v. Barnhart*, 345 F. Supp. 2d 1309, 1310 (S.D. Ala. 2004).

The ALJ conducted an initial hearing on July 31, 2014 (R. 292-320), and a supplemental hearing on May 12, 2015 (R. 263-89); he issued an unfavorable decision on January 28, 2016 (R. 338-355). George sought review with the Appeals Council, attaching new evidence postdating the decision and/or the hearings, including records from: (1) his July 23, 2015 total right knee replacement; and (2) his March 17, 2017 pacemaker surgery. (R. 362). The Appeals Council remanded the case to the ALJ with instructions to consider this new evidence. (*Id.*).

On remand, the July 26, 2018 hearing started with the ALJ stating there was "no explanation as to why this evidence was submitted late, but they remanded it anyway, so we're here." (R. 207). The ALJ returned to this complaint later in the hearing, noting George's counsel "filed records that should've been filed before the last hearing." (R. 246). Notably, all of the new evidence about which the ALJ complained concerned medical records generated and medical care performed after the original and first supplemental hearings.

When George's counsel began discussing Dr. Dyas's sworn examination testimony, the ALJ interrupted him, saying it was entitled to "[n]o weight at all" and

that he wouldn't "pay attention" to it because it consisted of *ex parte* statements in response to counsel's "leading questions." (R. 237-38). When George's counsel noted the statements were given under oath, the ALJ responded:

> It's like that circle form that's used all the time. They're never supported. They—that's like, circle this form, and you send it in with no support . . . and then you take the deposition and lead the doctor down the road.

(R. 238). None of these reasons justify ignoring Dr. Dyas's opinions.

The ALJ also demonstrated confusion regarding George's physical problems. When George's counsel discussed Dr. Dyas's repeated findings of paraspinal muscle spasms and markedly positive straight leg tests, the ALJ interrupted to point out these findings were prior to George's surgery. (R. 243). George's counsel explained these tests related to spinal—not knee—problems, and the ALJ responded, "I don't think it's this gentleman's back that's bothering him. I think it's his knees and his legs." (R. 244). Similarly, when counsel discussed Dr. Dyas's diagnoses of George's cervical spine issues, the ALJ interrupted by saying, "He's not complaining that he can't work because of his neck." (R. 244). These conclusions ignore the testimony George had given minutes earlier, as well as nine years of Dr. Dyas's treatment records. (*See* R. 211).

Finally, in dismissing George's subjective complaints of pain, the ALJ misstated the law regarding subjective testimony. (R. 244-45). Specifically, the ALJ stated he wasn't "allowed to do credibility anymore. We're not able—we can't

even touch it." (R. 245). The ALJ returned to this misinterpretation shortly thereafter, stating "we no longer can even do credibility determinations." (R. 246). However, SSR 16-3p explicitly allows an ALJ to consider a claimant's subjective statements concerning their symptoms and attendant effects.

A Social Security claimant is entitled to a "full and fair" hearing. *Miles,* 84 F.3d at 1400. The ALJ plays a "crucial role in the disability review process" and has a duty to "develop a full and fair record" and to "carefully weigh the evidence, giving individualized consideration to each claim." *Id.* at 1401. Because the ALJ's decision will typically be the final word given our standard of review, the ALJ's impartiality is "integral to the integrity of the system." *Id.* The ALJ thus must "not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." *Id.* at 1400 (quoting 20 C.F.R. § 404.940).

At the July 26, 2018 hearing, the ALJ: (1) attributed error to George's counsel for failing to submit yet-to-be generated medical records at the prior hearings; (2) mischaracterized Dr. Dyas's sworn examinations as consisting of cursory answers to leading questions; (3) declared he would not afford any weight to Dr. Dyas's sworn examinations; (4) mistakenly stated George did not claim disability due to neck and back and neck problems, despite George's testimony earlier in the hearing and years of medical records documenting those very problems; and (5) misstated

the standard for evaluating George's subjective complaints, implying that he could not consider them at all.

To be fair, the ALJ corrected some of these deficiencies in his decision. The decision addressed George's complaints of neck and back problems. However, the ALJ's decision added other problems, including unnecessarily questioning Dr. Dyas's credibility by erroneously stating the record did not support his sworn statement regarding the number of times he examined George. Additionally, while the ALJ's decision did address Dr. Dyas's opinions, it ultimately gave them little weight—as promised during the hearing.

The foregoing circumstances are insufficient to establish ALJ bias. They are, however, sufficient to call his partiality into question. *Mastison v. Astrue*, No. 07-0129, 2008 WL 2038250, at *9 (N.D. Fla. May 12, 2008) (reversing and remanding for consideration by a different ALJ where the original ALJ failed "to make a fair review of all medical information without pre-judging the impact of any particular physician's work"). Under the facts of this case and considering this matter has already necessitated three hearings and two ALJ decisions totaling nearly sixty single-spaced pages, the Commissioner will be ordered to assign this matter to a new ALJ on remand.

## IV.  CONCLUSION

For all of the foregoing reasons, the ALJ's decision is not supported by substantial evidence.  Accordingly, this matter will be reversed and remanded to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  The Commissioner will be ordered to assign this matter to a different ALJ on remand.

**DONE** this 14th day of July, 2021.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE